**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

LAURA LEE TABAKIAN,

        Plaintiff,

    v.

THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

        Defendant.

CIVIL ACTION NO. 4:19-cv-00073

**O R D E R**

    Presently before the Court are Plaintiff Laura Lee Tabakian's Motion for Summary Judgment, (doc. 20), and Defendant The Lincoln National Life Insurance Company's Motion for Summary Judgment, (doc. 23). In this ERISA action, Plaintiff contests The Lincoln National Life Insurance Company ("Lincoln")'s decision to deny her long-term disability benefits, and in her Summary Judgment Motion she urges the Court to award her all unpaid benefits due under the subject policy. (Doc. 1; doc. 20.) Lincoln also seeks summary judgment, arguing that its decision to deny long-term disability benefits was not unreasonable given the medical evidence before it. (Doc. 23.) Both Plaintiff and Lincoln filed responses, (doc. 27; doc. 29), to the other party's respective Motion for Summary Judgment, and then both parties filed replies, (doc. 34; doc. 35). For the following reasons, the Court **GRANTS** Lincoln's Motion for Summary Judgment, (doc. 23), and **DENIES** Plaintiff's Motion for Summary Judgment, (doc. 20). The Court **DIRECTS** the Clerk of Court to enter summary judgment in favor of Lincoln and to **CLOSE** this case.

## BACKGROUND

### I.   Plaintiff's Prior Employment and Insurance

Plaintiff's challenge to Lincoln's denial of long-term disability ("LTD") benefits arises under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq., commonly known as ERISA.  (See doc. 1.)  At the time of her disability claim, Plaintiff worked as a Practice Manager for SouthCoast Medical Group.  (Doc. 24-2, pp. 1, 159.)  As part of this job, Plaintiff had to sit for six hours a day, lift less than fifteen pounds, and make frequent repetitive motions.  (Id. at p. 159.)  Her tasks included typing and using the phone.  (Id. at p. 562.)  SouthCoast Medical Group provided its employees with LTD benefits issued under a policy (the "Policy") provided by Lincoln.  (Id. at pp. 48, 51.)  In addition to issuing the Policy, Lincoln also served as the claims administrator.  (Id. at p. 64.)  This Policy was subject to ERISA.  (Id. at p. 105.)

### II.   The Policy's Terms

Under the terms of the Policy, Lincoln was required to "pay a Total Disability Monthly Benefit to an Insured Employee, after the completion of the Elimination Period, if he or she is [among other things] Totally Disabled . . . [and] submits proof of continued Total Disability and Physician's care to the Company upon request."  (Id. at p. 71.)  Totally Disabled is partly "defined as follows: During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation."  (Id. at p. 60.)  In addition, the Elimination Period "means the number of days of Disability during which no benefit is payable."  (Id. at p. 56.)  The Elimination Period "begins on the first day of Disability[,]" (id.), and requires "180 calendar days of Disability caused by the same or a related Sickness or Injury, which must be accumulated within a 360 calendar day period[,]" (id. at p. 51).

2

In addition, under the Policy, Lincoln required "written proof of claim within 90 days after the end of the Elimination Period." (Id. at p. 63.)  Proof of claim includes providing, among other things, "the date the Disability began, its cause and degree" and "a completed statement by the attending Physician, which must describe any restrictions on the Insured Employee's performance of the duties of his or her Regular Occupation." (Id.)  The Policy also provides Lincoln with the option to have any "Insured Employee examined by a Physician, specialist or vocational rehabilitation expert" of Lincoln's choosing. (Id.)  Finally, Lincoln reserved the authority to "to manage this Policy, interpret its provisions, administer claims and resolve questions arising under it." (Id. at p. 65.)

## III.     Plaintiff's LTD Claim and Appeals

### A.     Plaintiff's Health Issues

On October 13, 2015, Plaintiff underwent surgery to repair a hernia on her right lateral abdomen. (Id. at pp. 5, 234.)  After the surgery, Plaintiff developed hypotension. (Id. at p. 5.) Plaintiff's endocrinologist, Dr. Joseph DeHaven, was called in to consult. (Id. at p. 491.)  Dr. DeHaven drew a random cortisol, which was "markedly low," and "did a cosyntropin test which was markedly abnormal." (Id.)  Dr. DeHaven found that this data was "consistent with secondary adrenal insufficiency." (Id.)  However, an MRI of the pituitary did not reveal anything abnormal. (Id.)  Plaintiff also reported being tired. (Id.)  As of October 20, 2015, Dr. DeHaven's assessment was "[i]diopathic secondary adrenal insufficiency" and he prescribed Plaintiff hydrocortisone. (Id.)  Tests show that Plaintiff's cortisol levels had returned to 18.8 ug/dL by October 28, 2015 which is within the noted reference range. (Id. at p. 505.)  Plaintiff did not go back to work at SouthCoast Medical Group after her hernia surgery resulting in her last day of work being October 12, 2015. (Id. at p. 159.)

On November 2, 2015, Plaintiff visited her primary care physician, Dr. Bobbie Kumar. (Id. at p. 234.)  She told Dr. Kumar that she felt "fatigued and run down and weak."  (Id.)  A physical exam of Plaintiff revealed nothing abnormal.  (Id. at pp. 234–35.)  Plaintiff also reported feeling anxious, and Dr. Kumar prescribed Xanax.  (Id. at p. 235.)  Dr. Kumar makes no mention of Plaintiff's condition preventing her from working at SouthCoast Medical Group.  (Id.)  Plaintiff returned to a follow-up appointment with Dr. Kumar on November 17, 2015 where she advised that she had "recently restarted on . . . Cortef due to her cortisol a.m. level being severely low." (Id. at p. 239.)  She reported that she was "a lot better" but also still experienced fatigue and felt "very run down."  (Id.)  Again Dr. Kumar reported nothing abnormal from Plaintiff's physical exam and said nothing about Plaintiff's inability to work.  (Id.)

Plaintiff met with Dr. DeHaven on December 22, 2015.  (Id. at p. 490.)  She told him that "[s]he has felt better since being on the hydrocortisone but still is not up to par."  (Id.)  Dr. DeHaven's physical exam found no cardiac, thyroid, or chest problems, but he planned to schedule a test to check her for growth hormone deficiency.  (Id.)  On December 28, 2015, she again visited Dr. Kumar.  (Id. at p. 242.)  She told Dr. Kumar that she felt "worried almost all the time[,]" experienced memory problems, and had "constantly weak" muscles.  (Id.)  Dr. Kumar's physical examination once again revealed nothing out of the ordinary.  (Id. at pp. 242–43.)  Dr. Kumar ended the report noting that "until [Plaintiff] has a diagnosis I do not deem it necessary for her to return to work" and "I have given her time off until April 1 for us to get her medications under control so we may treat her appropriately."  (Id. at p. 243.)

The next month Plaintiff underwent growth hormone testing, and her results were all within the normal reference range of less than or equal to 7.1 ng/ml.  (Id. at pp. 497–500.)  The test results noted that they "are not reliable for diagnosing GH deficiency."  (Id.)  Plaintiff met with Dr.

DeHaven again on February 23, 2016.  (<u>Id.</u> at p. 489.)  She reported that she was experiencing chronic fatigue and, for the first time, myalgia.  (<u>Id.</u>)  Dr. DeHaven decided to check her "ANA, rheumatoid factor sedimentation rate, and CPK."  (<u>Id.</u>)  The ANA screen tested negative, and the remaining tests showed results within the normal reference range.  (<u>Id.</u> at pp. 492–494, 372.)  He stated that he "placed an order and [sic] for growth hormone therapy and . . . will see if this helps make her feels better."  (<u>Id.</u>)

### B.    Plaintiff Applies for LTD Benefits

Plaintiff applied for LTD benefits on March 2, 2016.  (<u>Id.</u> at pp. 514–22.)  Plaintiff submitted an "Employee Statement" wherein she described her reasons for being unable to work as "Fatigue/Headaches/muscle weakness/Joint Pain/Decreased ability to concentrate/Dizz[i]ness." (<u>Id.</u> at p. 518.)  She also submitted a "Physician's Statement" filled out by Dr. DeHaven.  (<u>Id.</u> at p. 520.)  Dr. DeHaven listed Plaintiff's primary diagnoses as adrenal insufficiency and growth hormone deficiency and listed her symptoms as fatigue and weakness.  (<u>Id.</u>)  Under objective findings, he listed "none."  (<u>Id.</u>)  He also wrote that Plaintiff's ability to work was "limited by her chronic fatigue," that her restrictions were "physical work" and that her limitations were "prolonged work."  (<u>Id.</u> at p. 521.)  He said his prognosis for recovery was "unknown."  (<u>Id.</u>) Finally, he indicated that Plaintiff could only sit for two hours at a time and could only stand or walk for one hour.  (<u>Id.</u>)  Plaintiff also attached her medical records from her appointments with Dr. DeHaven, (<u>id.</u> at 534–36), but not Dr. Kumar's records.

On April 5, 2016, Donna Willaert, a registered nurse and disability consultant, reviewed Plaintiff's application.  (<u>Id.</u> at pp. 9–10.)  After reviewing the application, Willaert concluded that:

> The symptoms are vague and there are almost no physical exam findings. The symptoms seem acutely related to the CLMT having hernia surgery in October for which she would be well[-]healed at this point.  Recent lab work shows normal or elevated levels of cortisol.  This file needs a peer review.

(Id. at p. 9.)  In line with this recommendation, Lincoln submitted Plaintiff's application to Dr. Elizabeth Haglind to complete a peer review report.  (Id. at pp. 472–75.)  After reviewing the medical records that Plaintiff submitted, Dr. Haglind found that "[f]rom an endocrinology perspective, there seems to be no clinical findings to support her symptom of fatigue."  (Id. at p. 474.)  She also found that "[t]he claimant should be able to work 8 hours a day, 5 days a week in a sedentary capacity."  (Id.)  She also noted that she had called Dr. DeHaven and reviewed with him her recommendations for "sedentary work, with lifting of 10 pounds in weight occasionally," and Dr. DeHaven reportedly "concurred with the recommendations."  (Id. at p. 472.)

On April 20, 2016, Lincoln denied Plaintiff's claim for LTD benefits explaining that, based on the information in her claim file, she did not meet the Policy's definition of total disability.  (Id. at p. 466.)  Lincoln notified Plaintiff that she could appeal, and that her appeal should include "any additional documentation to support the appeal, such as medical treatment records, laboratory results, x-rays or other testing results."  (Id. at p. 469.)

**C.    The Appeals Process**

Plaintiff, now represented by counsel, initiated her first appeal of Lincoln's decision to deny benefits on May 19, 2016.  (Id. at p. 433.)  In support of this appeal, Plaintiff provided additional evidence in the form of a letter by Dr. DeHaven, medical records from an April 28, 2016 appointment with Dr. DeHaven, reference material about the possible side effects of hydrocortisone treatment, and information about Dr. DeHaven's qualifications.  (Id. at p. 394.)  Dr. DeHaven's letter stated in part that Plaintiff "has adrenal insufficiency which is adequately replaced with hydrocortisone.  However, she also has growth hormone deficiency and fibromyalgia which I feel is the major cause for her fatigue and disability.  I disagree with her rejection for disability based on the adrenal insufficiency.  Please give her every reconsideration."

(Id. at p. 396.)  The records from the April 28, 2016 appointment with Dr. DeHaven indicated that Plaintiff was still experiencing chronic fatigue and that she "most likely has fibromyalgia."  (Id. at p. 397.)  Plaintiff's attorney argued in her appeal that Lincoln should give more consideration to Dr. DeHaven's opinion than Dr. Haglind's because Dr. DeHaven had examined Plaintiff multiple times.  (Id. at p. 395.)

Lincoln referred Plaintiff's appeal to another nurse disability consultant, Maureen Miller. (Id. at p. 26.)  Miller concluded that "[t]he medical findings do not support functional impairments of inability to perform" and that the "[a]dditional records provided for this appeal reflected no significant change in condition to alter the restrictions/limitations as stated in [Dr. Haglind's] peer review."  (Id. at p. 28.)  On July 26, 2016, Lincoln denied Plaintiff LTD on her first appeal, (id. at p. 368), finding that a "review of the medical records did not identify restrictions and limitations that would preclude her from performing her sedentary physical demand occupation."  (Id. at p. 374.)

On January 11, 2017, Plaintiff initiated her second appeal.  (Id. at p. 286.)  In support of her second appeal, Plaintiff supplied additional evidence.  (Id.)  First, she provided documentation showing that Colonial Life & Accident Insurance Company ("Colonial Life") had approved her claim for short-term disability benefits.  (Id. at pp. 288–93.)  Plaintiff also submitted evidence that the Social Security Administration had determined that she had been disabled since October 13, 2015 and awarded her Social Security Disability Insurance.  (Id. at pp. 220–33.)  Finally, Plaintiff also furnished more medical records which included submitting for the first time the records from her appointments with Dr. Kumar.  (Id. at pp. 234–48.)  In addition, she provided medical records from June 30, 2016, showing that a CT scan of her chest had identified a 18–19 millimeter left upper lobe mass.  (Id. at p. 263.)  A needle biopsy of the lobe resulted in a diagnosis of metastatic

renal cell carcinoma.  (Id. at p. 273.)  The records she submitted showed that, shortly thereafter, she underwent a procedure to remove the lobe.  (Id. at p. 278.)  In an August 19, 2016 follow-up visit at Southeast Lung Associates, Plaintiff was described as "doing well post operatively" but "still experiencing some weakness."  (Id.)  The records also showed that, at some point in early October 2016, Plaintiff was "without evidence of disease" but had "a significant risk of recurrence."  (Id. at p. 282.)  Nothing abnormal was reported on her physical exam.  (Id. at pp. 283–84.)  Notes from later doctor appointments show that she reported fatigue and myalgias at an October 19, 2016 appointment, (id. at p. 170), and she again reported fatigue on November 14, 2016, (id. at p. 282–83.)

In response to this second appeal, Lincoln referred Plaintiff's claim to Dr. Michael Farber to conduct an additional peer review.  (Id. at pp. 208–13.)  Dr. Farber summarized Plaintiff's medical record.  (Id. at pp. 209–10.)  He then determined, within a reasonable degree of clinical probability, that Plaintiff had been correctly "diagnosed with obesity, hypertension, secondary adrenal insufficiency, GH deficiency, and renal cell cancer with metastatic lung involvement s/p resection . . . however the medical evidence did not support any clear disease of severity enough or complication associated with therapeutic intervention to completely limit or restrict ability to function."  (Id. at p. 211.)  He also stated, after examining the medical data, that "subjective complaints appeared to be somewhat out of proportion to the degree of objective medical evidence provided for review as fatigue was somewhat refractory to use of steroids, Focalin, and SSRI agents and there was no reported use of CPAP for any clear diagnosis of OSA."  (Id. at pp. 211–12.)  Ultimately, while Dr. Farber found that Plaintiff's activity should be limited to carrying, lifting, pulling or pushing weight up to 20–25 pounds only occasionally and up to 5–10 pounds more frequently with the ability to take breaks if such activity were required continuously, he

determined there "was no limitation in [Plaintiff's] ability to sit, stand, walk, or reach or to perform full time cognitive and fine motor and fingering activity." (Id. at p. 212.)

Like Dr. Haglind, Dr. Farber also called Dr. DeHaven to discuss Plaintiff's condition. (Id. at p. 215.) According to Dr. Farber's summary of the conversation, Dr. DeHaven agreed that Plaintiff's "subjective complaints were out of proportion to the degree of objective medical evidence provided for review[,]" and "agreed loosely that Ms. Tabakian may be capable of a full day of light level function provided that she would have the ability to take occasional breaks if continuous activity were required for function." (Id.) On February 8, 2017, Dr. Farber faxed this summary to Dr. DeHaven giving him the opportunity to make corrections to anything in the summary within five business days, and advising that if no corrections were made, Dr. Farber would conclude that the summary was accurate. (Id. at pp. 214–15.) Nothing in the record indicates that Dr. DeHaven responded to this fax. Lincoln provided Plaintiff with a copy of Dr. Farber's conclusions on February 14, 2017. (Id. at p. 197.)

On March 5, 2017, Plaintiff submitted a letter from Dr. DeHaven. (Id. at pp. 148, 168.) He stated that Plaintiff had secondary adrenal insufficiency and "probable fibromyalgia and metastatic renal cell carcinoma." (Id.) He also wrote that Plaintiff had "chronic, debilitating fatigue from these multiple problems" and that he did not think she had been "capable of performing" her job since October 2015. (Id.)

On March 16, 2017, Theresa Henderson, a senior claims examiner for Lincoln, upheld the denial of benefits, explaining that Lincoln's "review of the medical documentation . . . does not support that [Plaintiff] was unable to perform the main duties of [her] own occupation from the date last worked and through the 180[-]day elimination period forward." (Id. at p. 144.) In her decision, Henderson noted that Plaintiff's entire file had been reviewed, and she quoted extensively

from Dr. Farber's peer review. (Id. at pp. 142–44.) Henderson also acknowledged Dr. DeHaven's letter but stated that

> we would like to point out the medical records provided by your client's physician(s) do not support the statements as noted in the letter. Please remember, the time period in question for Total Disability is from the date last worked 10/12/2015 and through the 180[-]day elimination period. We are bound to make the disability decision in accordance with the contract provisions and time periods defined therein.

(Id. at p. 144.) The decision also acknowledged that the Social Security Administration had awarded Plaintiff Social Security Disability Income. (Id. at p. 145.) However, Henderson explained that Lincoln's review process was independent of the Social Security Administration. (Id.) Finally, Henderson informed Plaintiff that she had exhausted the appeals process and had "the right to pursue litigation." (Id.)

## IV.     Procedural History of this Litigation

Plaintiff filed her Complaint with this Court on April 5, 2019, seeking LTD benefits. (Doc. 1.) Both parties filed their own Motions for Summary Judgment on June 30, 2020. (Doc. 20; doc. 23.) Plaintiff and Lincoln each filed a response to the other party's respective summary judgment motion. (Doc. 27; doc. 29.) Finally, both parties filed replies. (Doc. 34; doc. 35.)

## STANDARD OF REVIEW

Individuals who are "denied benefits under an employee benefit plan [may] challenge that denial in federal court," pursuant to Section 1132(a) of ERISA. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008); see also 29 U.S.C.A. § 1132. However, summary judgment in an ERISA case differs somewhat from summary judgment review in other cases. Ruple v. Hartford Life & Accident Ins. Co., 340 F. App'x 604, 610 (11th Cir. 2009) (per curiam). Unlike summary judgment typically, in an ERISA benefits denial case the court "does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled

before the plan fiduciary." Prelutsky v. Greater Ga. Life Ins. Co., 692 F. App'x 969, 972 n.4 (11th Cir. 2017) (per curiam) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17–18 (1st Cir. 2002)).  In other words, the court "sits more as an appellate tribunal than as a trial court." Curran v. Kemper Nat'l Servs., Inc., No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (per curiam) (citation omitted).   Accordingly, where an ERISA plan vests the plan administrator with discretionary authority over claims decisions, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exits, do not apply." Jones v. Fed. Express Corp., 984 F. Supp. 2d 1271, 1275 (M.D. Fla. 2013) (citations omitted).

ERISA itself does not provide an applicable standard for courts to review challenges to the benefits decisions of plan administrators.  Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011) (per curiam) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989)).  As a result, the Eleventh Circuit Court of Appeals has "established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decision," based on the United States Supreme Court's guidance in Firestone and Glenn.  Id.  Under this framework courts are to:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether [it] was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and [it] was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review [its] decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if [it] operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Id. at 1355 (citation omitted). In applying the framework, "[r]eview of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision." Id. at 1354 (citing Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1140 (11th Cir. 1989)). For purposes of ERISA, the "arbitrary and capricious" standard is synonymous with an "abuse of discretion." See id. at 1355 n.5.

## DISCUSSION

As an initial matter, the Policy is clear that Lincoln reserved the discretionary authority to "determine eligibility and resolve claims questions[,]" (doc. 24-2, p. 65), so, "all of the steps [of the review framework] are potentially at issue" in this case. Blankenship, 644 F.3d at 1356 n.7. As such, even if Lincoln's decision was "*de novo* wrong," the Court would still proceed to the next steps of the analysis and decide whether Lincoln's decision was arbitrary and capricious. Given this, "[s]ome courts have begun their analysis by assuming the plan administrator's decision was wrong and proceeded directly to the question of whether the administrator's decision was arbitrary and capricious." Howard v. Hartford Life & Accident Ins. Co., 929 F. Supp. 2d 1264, 1287 n.19 (M.D. Fla. 2013) (quotation and citation omitted). Accordingly, the Court assumes, without deciding, that Lincoln's denial of LTD benefits was "*de novo* wrong" (step one of the analysis) for purposes of this review and assesses Lincoln's denial decision under the more deferential arbitrary and capricious standard. "Under the arbitrary and capricious standard of review, the court seeks

'to determine whether there was a reasonable basis for the [administrator's] decision, based upon the facts as known to the administrator at the time the decision was made.'" Hunt v. Hawthorne Assocs., Inc., 119 F.3d 888, 912 (11th Cir. 1997) (quoting Jett, 890 F.2d at 1139). "The Court thus limits its review to whether the plan administrator's benefits determination 'was made rationally and in good faith—not whether it was right.'" Graham v. Life Ins. Co. of N. Am., 222 F. Supp. 3d 1129, 1138 (N.D. Ga. 2016) (quoting Griffis v. Delta Family-Care Disability, 723 F.2d 822, 825 (11th Cir. 1984)).

In her Motion, Plaintiff asserts that Lincoln wrongfully and unreasonably denied her LTD benefits claim because she has been disabled since October 13, 2015. (Doc. 20-1, pp. 12–17.) She argues that Lincoln erroneously discounted Dr. DeHaven's opinion and gave too much credence to the peer reviews. (Id. at pp. 12–14.) She also asserts that Lincoln did not adequately consider the findings of Colonial Life and the Social Security Administration. (Id. at pp. 13–14.) Finally, Plaintiff argues that a conflict of interest exists because Lincoln is both the insurer and the party denying benefits, and that this structural conflict should be considered. (Id. at pp. 11–12; doc. 29-1, p. 19.) In both its Response and its own Motion for Summary, Lincoln argues that it reasonably denied Plaintiff's claim based upon the information in the administrative record. (Doc. 23-1, pp. 10–24; doc. 27, pp. 8–15.) Lincoln additionally argues that its structural conflict should not alter the determination that it acted reasonably. (Doc. 23-1, pp. 24–25.) Under the arbitrary and capricious standard of review, applicable to this ERISA appeal, the Court finds that Lincoln had reasonable grounds to support its denial, and thus, **GRANTS** its Motion for Summary Judgment, (doc. 23), and **DENIES** Plaintiff's Motion for Summary Judgment, (doc. 20).

## I.     Lincoln's Consideration of Dr. DeHaven's Opinion and the Peer Review Reports

Plaintiff argues that Lincoln acted unreasonably by crediting the peer review opinions of Dr. Haglind and especially Dr. Farber over the opinion of Dr. DeHaven because Dr. Haglind "did not have the complete file when she made her evaluation" and, according to Plaintiff, "Dr. Farber's review was far less than thorough." (Doc. 20-1, p. 14.) Plaintiff's argument is unconvincing for several reasons. First, the Supreme Court has specifically held that, in the ERISA context, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). However, a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Id.

Lincoln argues that it did not arbitrarily discount Dr. DeHaven's opinion because, among other things, both peer reviewers spoke with Dr. DeHaven and wrote that he agreed with their findings. (Doc. 27, pp. 13–14.) Henderson's letter denying Plaintiff's second appeal explicitly states that Plaintiff's "entire file was reviewed." (Doc. 24-2, p. 142.) This review would necessarily have covered Dr. Haglind's notes explaining that she had discussed with Dr. DeHaven her recommendation that Plaintiff could perform "sedentary work, with lifting of 10 pounds in weight occasionally" and that Dr. DeHaven had "concurred" with this recommendation. (Id. at p. 472.) Likewise, the review would necessarily have shown that Dr. Farber spoke with Dr. DeHaven and he "agreed loosely that [Plaintiff] may be capable of a full day of light level function provided that she would have the ability to take occasional breaks if continuous activity were required for function." (Id. at p. 215.) Dr. Farber faxed the document that included this statement to Dr. DeHaven asking him to respond within five days with any corrections, (id. at pp. 214–15), and nothing in the record shows that Dr. DeHaven ever responded to Dr. Farber's fax. The record does

show that Dr. DeHaven did eventually write a letter stating that Plaintiff had "chronic, debilitating fatigue" and that he did not think she had been "capable of performing" her job since October 2015.  (Id. at p. 168.)  However, neither in this letter nor in any other statement in the record does Dr. DeHaven specifically refute the assertion that he agreed with either Dr. Haglind or Dr. Farber during his conversations with them.[1]  The Court is unaware of any precedent from the United States Supreme Court or the Eleventh Circuit that indicates that a claim administrator acts unreasonably by giving less credence to a doctor's opinion when the records indicate that the doctor actually offered varying opinions about the amount of work the plaintiff could perform.

Plaintiff does cite one opinion by the United States Court of Appeals for the Sixth Circuit in support of its argument that—given the "so-called inconsistencies" with his multiple written statements—Dr. DeHaven's reported statements during conversations with peer review doctors are "outliers [that] cannot be relied upon by Lincoln."  (Doc. 29-1, p. 17 (citing Glenn v. MetLife, 461 F.3d 660, 669 (6th Cir. 2006))).  In that case, the plaintiff's treating physician checked a box on a form indicating that the plaintiff could sit for eight hours a day and another box indicating that she could perform a "a sedentary physical exertion level occupation."  Glenn, 461 F.3d at 664. However, after checking these boxes, the treating physician wrote two letters stating that the plaintiff could not work and at least one of these letters specifically refuted his previous indication that the plaintiff could perform sedentary work.  Id. at 664–65.  The Sixth Circuit ultimately concluded that information provided by the checked boxes was so inconsistent with the rest of the

---

[1] With regard to Dr. DeHaven's conversations with Dr. Haglind and Dr Farber, Plaintiff argues that "[n]either of these out of court statements are reliable."  (Doc. 29-1, p. 16.)  To the extent Plaintiff argues that this evidence cannot be considered because it is hearsay, she is incorrect.  See, e.g., Herman v. Hartford Life & Accident Ins. Co., 508 F. App'x 923, 928 (11th Cir. 2013) (per curiam) ("[Plaintiff's] hearsay argument is misplaced, as the district court's review was limited only by what was available to the plan administrator, not by the Federal Rules of Evidence.") (citing Black v. Long Term Disability Ins., 582 F.3d 738, 746 n.3 (7th Cir. 2009)).

doctor's evidence that it was "aberrational," and that the claim adjudicator acted arbitrarily by favoring it over the other medical evidence.  Id. at 669–72.

Here, unlike in Glenn, there are two instances of Dr. DeHaven speaking with a peer review physician and indicating his agreement with the physician's opinion about Plaintiff's ability to work, which makes it harder to view them as aberrations.  In addition, none of Dr. DeHaven's letters indicate that either Dr. Haglind or Dr. Farber lied about his agreement.  Indeed, while Dr. DeHaven did provide other statements that ultimately disagreed with the peer review physician's conclusions, he never explained why those opinions differed from his reported agreements with both Dr. Haglind and Dr. Farber.  For these reasons, the Court does not find Glenn persuasive when applied to the facts of this case.

Lincoln also argues that it did not act arbitrarily by not crediting Dr. DeHaven's opinion about Plaintiff's inability to work because "Dr. DeHaven's contemporaneous records contain no physical exam data or other objective evidence showing any disabling condition."  (Doc. 23-1, p. 19.)  Henderson's decision denying Plaintiff's claim during her second appeal specifically quotes the portion of Dr. Farber's peer review that states "the medical evidence did not support any clear disease of severity enough or complication associated with therapeutic intervention to completely limit or restrict ability to function."  (Doc. 24-2, p. 143.)  Dr. Farber's peer review goes on to state that "subjective complaints appeared to be somewhat out of proportion to the degree of objective medical evidence provided for review as fatigue was somewhat refractory to use of steroids, Focalin, and SSRI agents and there was no reported use of CPAP for any clear diagnosis of OSA."  (Id. at p. 211–12.)  Plaintiff argues that there is no objective test to determine whether fatigue is severe enough to disable people, and that "[c]ourts have held repeatedly that to require objective

evidence of a condition which cannot be proven objectively is arbitrary and capricious."[2]  (Doc. 20-1, p. 16.)

Plaintiff cites Oliver v. Coca Cola Co. as support for her assertion that a claim adjudicator cannot require objective evidence for a disability claim.  (Id. at pp. 16–17 (citing Oliver v. Coca Cola Co., 497 F.3d 1181, 1196 (11th Cir. 2007), *reh'g granted, opinion vacated in part by* 506 F.3d 1316 (11th Cir. 2007)).)  In that case, under the terms of the plan, an employee was "required only to submit a 'written application on a form provided by his Employer,' and provide 'medical certification' of his disability" in order to receive disability benefits under the plan.  Id. at 1196. The court emphasized that, "[u]nder the terms of the Plan, then, [plaintiff] was entitled to disability payments so long as he submitted a written application and provided medical certification that he was 'disabled' within the meaning of the Plan."  Id.  The plaintiff suffered from fibromyalgia but was denied benefits because the claim administrator said he failed to provide "objective evidence" for the level of pain he experienced.  Id.  However, the Eleventh Circuit observed that "much medical evidence, especially as it relates to pain, is inherently 'subjective' in that it cannot be quantifiably measured."  Id.  The court ultimately found that "[a]lthough in some contexts it may

---

[2] Plaintiff also asserts that Lincoln did not mention the lack of objective evidence in its denial of Plaintiff's benefits, so it cannot make a *post hoc* argument about it now.  (Doc. 29-1, p. 18.)  While it is true that Lincoln did not specifically mention "objective evidence" in its denial letters, it did specifically quote Dr. Farber's statement that "the medical evidence did not support any clear disease of severity enough or complication associated with therapeutic intervention to completely limit or restrict ability to function." (Doc. 24-2, p. 143.)  In his report, Dr. Farber ties this statement to his finding that Plaintiff's subjective complaints about fatigue were out of proportion to "objective medical evidence."  (Id. at p. 211.)  Thus, while Lincoln could have been clearer in its decision letter, it is still apparent that the lack of objective medical evidence was a reason for Lincoln's denial of the claim.  In addition, the Eleventh Circuit has never held that an insurer cannot put forth *post hoc* arguments to support its denial of a claim when a district court is reviewing the decision under the deferential arbitrary and capricious standard of review.  Indeed, the Eleventh Circuit has only examined this issue in an unpublished case where it stated that "[a] district court may choose not to accord self-serving post-hoc explanations much weight . . . , but it is not error to consider them."  Tippitt v. Reliance Standard Life Ins. Co., 276 F. App'x 912, 915 (11th Cir. 2008) (per curiam). Accordingly, even if the Court did determine that Lincoln was asserting a *post hoc* argument, it could still consider it.

not be arbitrary and capricious to require clinical evidence of the etiology of allegedly disabling symptoms in order to verify that there is no malingering, we conclude that it was arbitrary and capricious to require such evidence in the context of this Plan and [plaintiff's] diagnosis." Id. at 1997 (quotation and citation omitted).

In the present case, to receive benefits, the Policy required that Plaintiff "submit[] proof of continued Total Disability" and it gave Lincoln the right to "determine what information the Company reasonably require[d] to [determine eligibility and resolve claims questions]." (Doc. 24-2, pp. 71, 105.) This differs from the less strenuous policy language in Oliver, which required nothing more than a written application and "medical certification" that the claimant was "'disabled' within the meaning of the Plan." Oliver, 497 F.3d at 1196. The Eleventh Circuit has distinguished more rigorous policies from the one in Oliver and recognized that "it is not unreasonable for the plan administrator to demand objective evidence where the plan administrator has discretion to determine what it considers adequate 'proof' of disability." Keith v. Prudential Ins. Co. of Am., 347 F. App'x 548, 551 (11th Cir. 2009) (per curiam) (quoting Wangenstein v. Equifax, Inc., 191 F. App'x 905, 913–14 (11th Cir. 2006) (per curiam)). Here, because the Policy gave Liberty the discretion to "determine what information" was needed to decide eligibility, Lincoln had the ability to require more objective evidence from Plaintiff. See, e.g., Pinto v. Aetna Life Ins. Co., No. 6:09–cv–01893–Orl–22GJK, 2011 WL 536443, at *11 (M.D. Fla. Feb. 15, 2011) ("Here, on the other hand, the Policy explicitly requires that Plaintiff provide proof of her disability, and proof certainly connotes some objective evidence.") (citing Watts v. BellSouth Telecomms., Inc., 218 F. App'x 854, 856 (11th Cir. 2007) (per curiam)).

In addition, the present case differs from Oliver because in that case the claim administrator denied the "claim on the ground that [plaintiff] had not provided 'objective' evidence of his pain."

Oliver, 497 F.3d at 1197.  Here, in contrast, Lincoln relied on Dr. Farber's peer review which did

not dispute that Plaintiff had several medical diagnoses but asserted that the fatigue associated

with these diagnoses would not prevent Plaintiff from the "ability to sit, stand, walk, or reach or

to perform full[-]time cognitive and fine motor and fingering activity."  (Doc. 24-2, pp. 143–144.)

Thus, the issue was not whether Plaintiff had objective evidence of diagnoses that could cause

fatigue but whether Plaintiff had objective evidence that her fatigue prevented her from doing her

job, "[a]nd where a condition is subjective in nature [like fatigue], 'it is reasonable to expect

objective medical evidence of an inability to work.'"  Bloom v. Hartford Life & Accident Ins. Co.,

917 F. Supp. 2d 1269, 1282 (S.D. Fla. 2013) (quoting Creel v. Wachovia Corp., No. 08-10961,

2009 WL 179584, at *9 (11th Cir. Jan. 27, 2009)); see also Boardman v. Prudential Ins. Co. of

Am., 337 F.3d 9, 16 n.5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and

fibromyalgia may not lend themselves to objective clinical findings, the physical limitations

imposed by the symptoms of such illnesses do lend themselves to objective analysis.").

Finally, Plaintiff's case also differs from that of the plaintiff in Oliver because that plaintiff

submitted "the medical opinions of numerous treating physicians . . ., two positive EMGs, a nerve

conduction test, and an MRI."  Oliver, 497 F.3d at 1197.  Plaintiff did not submit nearly this much

evidence despite Lincoln telling her that she could include "additional documentation to support

the appeal, such as medical treatment records, laboratory results, x-rays or other testing results."

(Doc. 24-2, p. 469.)  In addition, on her second appeal, Plaintiff included the medical records from

her appointments with Dr. Kumar.  (Id. at pp. 234–48.)  Dr. Kumar's records show that Plaintiff

reported feeling fatigued, but Dr. Kumar's physical examination did not find anything abnormal.

(Id. at pp. 234, 242.)  During Plaintiff's several visits to Dr. Kumar, the doctor only once noted

that she did "not deem it necessary" for Plaintiff to return to work—because, she said, Plaintiff did

not yet "ha[ve] a diagnosis" and needed time "to get her medications under control"—and she never stated that Plaintiff's fatigue *prevented* her from doing her job. (Id. at p. 243.) Thus, unlike the Oliver plaintiff, who had numerous treating physicians supporting his claim, Plaintiff only had Dr. DeHaven (who, as the Court has already explained, twice agreed that Plaintiff could perform her job).

For all the above reasons, the Court finds that Lincoln did not act arbitrarily and capriciously by crediting the peer review reports over Dr. DeHaven's opinion.[3]

## III.    The Social Security Disability Insurance and Short-Term Insurance Awards

Plaintiff also argues that Lincoln's denial of benefits was arbitrary and capricious in light of the fact that the Social Security Administration awarded her Social Security Disability Insurance and Colonial Life granted her claim for short-term disability benefits. (Doc. 29-1, p. 12.) According to the record, the Social Security Administration found that Plaintiff became disabled on October 13, 2015, and awarded her disability benefits. (Doc. 24-2, pp. 226, 228.) However, "an award of benefits by the Social Security Administration is not dispositive . . . , particularly given the measure of deference . . . afford[ed to] a plan administrator's decision." Paramore v.

---

[3] In one paragraph of her Brief, Plaintiff notes that Lincoln had the ability under the Policy to require Plaintiff to be examined by a physician of Lincoln's choosing and that it did not do so. (Doc. 20-1, p. 14.) She argues that Lincoln's decision to forego this option and rely on the peer reviews instead "raises questions" about Lincoln's evaluation of her claim. (Id.) In support of this argument, Plaintiff cites no cases from the Eleventh Circuit but does cite one case from the Sixth Circuit. (Id. (citing Calvert v. Firstar Fin., Inc., 409 F.3d 286, 296–97 (6th Cir. 2005)). In Calvert, the Sixth Circuit stated that a "[defendant's] reliance on a file review does not, standing alone, require the conclusion that [defendant] acted improperly . . . [but the failure to conduct a physical examination] may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." Calvert, 409 F.3d at 295. The Sixth Circuit ultimately found that the defendant acted arbitrarily and capriciously because it relied on a peer review where the doctor conducted a "clearly inadequate" review of the medical file. Id. at 296. Specifically, the doctor's peer review did "not describe the data he reviewed in reaching his conclusion" and made "no mention of the surgical reports, x-rays or CT scans in the record." Id. Here, in contrast, Dr. Farber's report provided an outline of all the records he reviewed in preparing his report and dedicated several paragraphs to summarizing those records. (Doc. 24-2, pp. 209–11.) For this reason, the Court finds Calvert inapplicable and Plaintiff's argument unavailing.

20

Delta Air Lines, Inc., 129 F.3d 1446, 1452 n.5 (11th Cir. 1997). For example, "when an ERISA claim administrator has different information from what was available to the SSA, this commonplace circumstance is one of the many reasons *not* to consider a decision by the social security administration for ERISA purposes." Ness v. Aetna Life Ins. Co., 257 F. Supp. 3d 1280, 1293 (M.D. Fla. 2017) (emphasis in original) (citations and quotations omitted).

In the denial of Plaintiff's second appeal, Henderson acknowledged that the Social Security Administration had awarded Plaintiff disability benefits but explained that Lincoln's "group policy and review process is independent from that of the Social Security Administration." (Doc. 24-2, p. 145.) Henderson also pointed out that the Social Security Administration's decision was based on the information that it had received, and that Lincoln's decision was based on the information that Plaintiff supplied Lincoln. (Id.) The administrative record does show that the Social Security Administrative had some of Plaintiff's medical records, but there is no indication that the Social Security Administration and Lincoln reviewed all of the same medical records. (Id. at pp. 222–24.) Indeed, there is no indication that the Social Security Administration ever reviewed Dr. Kumar's medical records. In addition, Henderson's denial also explained that Lincoln applied its own "internal and/or independent reviews" of Plaintiff's claim. (Id. at p. 145.) As the Court has already explained, no deference is owed to a treating physician in the review of a claim in the ERISA context; critically, however, the Social Security Administration does owe this deference. See Herman v. Metro. Life Ins. Co., 689 F. Supp. 2d 1316, 1326 (M.D. Fla. 2010) ("The legal principles controlling the Social Security analysis are different from those governing the ERISA analysis. For example, whereas a treating physician's opinion is given priority in the Social Security context, the same is not true in the ERISA context.") (citing Nord, 538 U.S. at 833–34).

For all these reasons, the Court finds that Lincoln did not act arbitrarily and capriciously by not agreeing with the Social Security Administration's decision that Plaintiff was disabled.

Finally, it is true that Colonial Life, an insurance group, found that Plaintiff was disabled and eligible for short-term disability benefits.  (Doc. 24-2, pp. 288–93.)   However, in order to be eligible for short-term disability benefits under the Colonial Life plan, Plaintiff only had to qualify as disabled for that policy's fourteen-day elimination period.  (Id. at p. 288.)  In denying Plaintiff LTD benefits, Henderson clearly explained that "the time period in question for Total Disability is from the date last worked 10/12/2015 and through the 180[-]day elimination period."  (Id. at p. 144.)  Thus, even if Plaintiff had been disabled for the fourteen-day period required by Colonial Life this would not satisfy the 180-day period required to receive benefits under Lincoln's Policy. Furthermore, Plaintiff provides no Eleventh Circuit authority to support her contention that Lincoln's disagreement with another insurance company about whether Plaintiff qualified as disabled shows that Lincoln acted arbitrarily and capriciously.  Accordingly, the Court finds that Lincoln acted reasonably when it denied LTD benefits even though Colonial Life awarded short-term disability benefits.

## IV.    Lincoln's Structural Conflict

Generally, upon concluding that reasonable grounds support Lincoln's denial of LTD benefits, the Court should evaluate whether a conflict of interest influenced that decision.  As the Eleventh Circuit has stated, "[a] pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds." Blankenship, 644 F.3d at 1355.  Even if a conflict of interest exists, it is only "'a factor' in the analysis: but the basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision."  Id. (citing Conkright v. Frommert, 559 U.S. 506, 521 (2010)).

Ultimately, "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." <u>Doyle v. Liberty Life Assurance Co. of Boston</u>, 542 F.3d 1352, 1360 (11th Cir. 2008).

Here, it is undisputed that, under the Policy, Lincoln determined a claimant's eligibility for LTD benefits and, if the claimant was eligible, paid out those benefits to the claimant.  (Doc. 24-2, p. 64.)  Plaintiff asserts Lincoln's conflict is the only thing that "adequately explains why Lincoln ignored the findings of Tabakian's doctor, the Social Security Administration and Colonial Life."  (Doc. 29-1, p. 19.)  However, as the Court has already explained, Lincoln did not ignore this evidence but made a reasonable decision to deny benefits based on the entire record before it.  For its part, Lincoln argues that its "structural conflict is not an important consideration."  (Doc. 23-1, p. 24.)  Indeed, the Eleventh Circuit has stated that "'[t]he presence of a structural conflict of interest—an unremarkable fact in today's marketplace—constitutes no license, in itself, for a court' to overturn an otherwise reasonable benefits decision." <u>Prelutsky</u>, 692 F. App'x at 975 (quoting <u>Blankenship</u>, 644 F.3d at 1356).  In addition, even taking this conflict of interest into consideration, Plaintiff has not carried her burden of showing that the decision to deny her claim was arbitrary and capricious.  <u>See, e.g.</u>, <u>Harvey v. Standard Ins. Co.</u>, 850 F. Supp. 2d 1269, 1292 (N.D. Ala. 2012) ("To the extent any conflict existed, [plaintiff] has not met her burden of establishing persuasive indicators that the conflict so tainted [defendant's] decision such as to render it arbitrary and capricious.").  She has not shown that Lincoln's conflict was "anything other than standard industry practice." <u>Prelutsky</u>, 692 F. App'x at 975 (citations and internal quotations omitted).  Thus, the Court finds that Lincoln's structural conflict of interest did not impact its decision-making process in a way that made its decision here arbitrary and capricious.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** The Lincoln National Life Insurance Company's Motion for Summary Judgment, (doc. 23), and **DENIES** Laura Lee Tabakian's Motion for Summary Judgment, (doc. 20).  The Court **DIRECTS** the Clerk of Court to enter summary judgment in favor of Lincoln and to **CLOSE** this case.

**SO ORDERED**, this 26th day of March, 2021.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA